# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **RICHARD B. LAWSON,** | ) | |
| Plaintiff | ) | Civil Action No. 2:22cv00029 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MARTIN J. O'MALLEY[1],** | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |
| | ) | |

## *I. Background and Standard of Review*

Plaintiff, Richard B. Lawson, ("Lawson"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). Neither party has requested oral argument; therefore, this case is ripe for decision. As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were

---

[1] Martin J. O'Malley, ("O'Malley"), became the Commissioner of Social Security on December 20, 2023. Pursuant to Federal Rules of Civil Procedure Rule 25(d), O'Malley should, therefore, be substituted for Kilolo Kijakazi as the defendant in this case. Pursuant to the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), no further action is required to continue this suit.

reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Lawson protectively filed his application for DIB[2] on February 11, 2021, alleging disability as of October 9, 2020, (Record, ("R.") at 17, 2057-13), based on post-traumatic stress disorder, ("PTSD"), anxiety, depression, problems being around others including in crowds, problems handling noise, arthritis of knee, trouble sleeping, panic attacks and hypertension.  (R. at 108, 121.)

---

[2] Lawson previously filed an application for DIB on May 29, 2019, alleging disability beginning December 2, 2018. (R. at 90.) By decision dated October 14, 2020, the ALJ denied his claim. (R. at 90-103.)

Pursuant to the Fourth Circuit's opinion in *Albright v. Comm'r of Soc. Sec. Admin.,* 174 F.3d 473 (4th Cir. 1999), and in accordance with Social Security Acquiescence Ruling, ("A.R.") 00-1(4), "[w]hen adjudicating a subsequent disability claim arising under the same … title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding as evidence" and consider its persuasiveness in light of all relevant facts and circumstances. A.R. 00-1(4), 65 Fed. Reg. 1936-01, at *1938, 2000 WL 142361 (Aug. 1, 1991). Those standards have been superseded by 20 C.F.R. § 404.1520c, which prescribes how to consider persuasiveness of opinion evidence and prior administrative findings in claims made on or after March 27, 2017. Because this claim was made after March 27, 2017, the ALJ is required to consider prior ALJ decisions and Appeals Council findings under *Albright. See* Program Operations Manual System, DI 24503.005, available at https://policy.ssa.gov/poms.nsf/lnx/0424503005 (effective Apr. 13, 2021) (explaining the categories of evidence).

The ALJ in this case noted that he had reviewed the October 14, 2020 decision and found that Lawson's health conditions had deteriorated substantially from the time of the previous decision, and, as a result, the prior ALJ's decision was given little weight, and the ALJ in this case made a different finding as to Lawson's residual functional capacity. (R. at 35-36.)

The claim was denied initially and upon reconsideration. (R. at 144-53.) Lawson then requested a hearing before an administrative law judge, ("ALJ"). (R. at 156-57.) The ALJ held a hearing on May 24, 2022, at which Lawson was represented by counsel. (R. at 47-70.)

By decision dated June 2, 2022, the ALJ denied Lawson's claim. (R. at 17-40.) The ALJ found Lawson meets the nondisability insured status requirements of the Act for DIB purposes through December 31, 2024. (R. at 20.) The ALJ found Lawson had not engaged in substantial gainful activity since October 9, 2020,[3] the alleged onset date. (R. at 20.) The ALJ determined that Lawson had severe impairments, namely, left knee osteoarthritis, cervicalgia, left shoulder pain, left hand hypoesthesia, coronary artery disease, hypertension, obesity, PTSD, generalized anxiety disorder and major depressive disorder, but he found Lawson did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20-21.)

The ALJ found that Lawson had the residual functional capacity to perform sedentary work,[4] except he can occasionally climb stairs and ramps, balance and stoop; cannot kneel, crouch, crawl or climb ladders, ropes or scaffolds; can

---

[3] Therefore, Lawson must show he was disabled between October 9, 2020, the alleged onset date, and June 2, 2022, the date of the ALJ's decision, to be eligible for benefits.

[4] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally, and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2023).

frequently perform reaching and feeling with the left upper extremity; should avoid concentrated exposure to vibrations and industrial hazards; should avoid exposure to loud noise, such as heavy traffic; can perform simple tasks and maintain attention and concentration for two-hour segments with regular breaks; should avoid work with strict hourly or daily production quotas; can occasionally interact with co-workers and supervisors, but should work independently and not in tandem with others; cannot interact with the public; can adapt to occasional changes in the customary workplace setting; would be off task 10 percent of the workday; and would be absent from work one day per month. (R. at 26.) The ALJ found Lawson was unable to perform any past relevant work. (R. at 37.) Based on Lawson's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that Lawson could perform, including the jobs of an addresser, a document preparer and a lens inserter. (R. at 37-38.) Thus, the ALJ concluded that Lawson was not under a disability as defined by the Act from the alleged onset date of October 9, 2020, through the date of the decision, June 2, 2022, and he was not eligible for DIB benefits. (R. at 39-40.) *See* 20 C.F.R. § 404.1520(g) (2023).

After the ALJ issued his decision, Lawson pursued his administrative appeals, (R. at 202-04), but the Appeals Council denied his request for review. (R. at 1-5.) Lawson then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2023). This case is before this court on Lawson's motion for summary judgment filed March 30, 2023, and the Commissioner's motion for summary judgment filed May 31, 2023.

## II. Facts

Lawson was born in 1975, (R. at 37), which, at the time of the ALJ's decision, classified him as a "younger person" under 20 C.F.R. § 404.1563(c). Lawson is a high school graduate and has past work experience as a home builder and a corrections officer. (R. at 37, 51-52.)

In rendering his decision, the ALJ reviewed records from Jo McClain, Psy.D., a state agency psychologist; Dr. Daniel Camden, M.D., a state agency physician; Stephen Saxby, Ph.D., a state agency psychologist; Dr. Richard Surrusco, M.D., a state agency physician; Dr. John Scott Litton, M.D., at Litton Family Medicine, P.C.; Chris Russell, L.P.C., at Western Lee County Health Clinic and Jonesville Family Health Center; Crystal Burke, L.C.S.W., at Appalachian Family Health Center; Deidra Fisher-Taylor, A.C.S.W./L.C.S.W.; and Wellmont Cardiology Services.

By way of background, on December 2, 2018, Lawson suffered a work injury while working at Red Onion State Prison when an inmate stabbed him in the head, shoulders and back. (R. at 220-23, 232, 333, 411.) Lawson testified that, while he attempted to return to work shortly after the incident, he felt that his PTSD and related weight gain, depression and anxiety prohibited him from being able to do so, ultimately resulting in the alleged disability onset date of October 9, 2020. (R. at 54-55, 207.)

On November 2, 2020, Lawson visited his primary care physician, Dr. John Litton, M.D., with complaints of anxiety, depression, panic attacks, disturbed sleep

and left knee pain. (R. at 514.) Lawson stated that his left knee pain had begun during a takedown procedure following Lawson's stabbing in the prison. (R. at 514.) Dr. Litton noted in his physical exam that Lawson was morbidly obese; had a normal gait, but decreased range of motion with left knee flexion and extension; and he was alert and oriented, but anxious. (R. at 516.) The remainder of Lawson's examination findings were normal. (R. at 516.) Dr. Litton diagnosed generalized anxiety disorder. (R. at 517.) Dr. Litton noted that, while he attributed Lawson's increased anxiety to the recent denial of long-term disability benefits, Lawson's condition was decompensated from his previous visit, so Dr. Litton prescribed prazosin to alleviate Lawson's symptoms and scheduled a follow up for six weeks. (R. at 517.) A week later, on November 9, 2020, Lawson visited Dr. Litton again with an eye infection and complaints of continued joint pain. (R. at 518.) Lawson did not complain of any sleeplessness, anxiety or depression at this visit. (R. at 518.) Aside from the eye infection, Dr. Litton's physical examination findings were unchanged from Lawson's last visit. (R. at 520.) Dr. Litton diagnosed Lawson with primary generalized osteoarthritis and derangement of unspecified left knee meniscus due to old tear or injury, and he recommended that Lawson use Tylenol, ice, elevation and exercise for relief. (R. at 520-21.) Dr. Litton also ordered magnetic resonance imaging ("MRI") to rule out a possible meniscus tear. (R. at 521.) The November 12, 2020, MRI of Lawson's left knee showed a large Baker's cyst, suspected medial collateral ligament, ("MCL"), sprain/low-grade partial tear and blunting of the free edge of the posterior horn of the medial meniscus. (R. at 537-38.)

On December 14, 2020, Lawson saw Dr. Litton to follow up on his generalized anxiety disorder. (R. at 527.) Lawson reported joint stiffness and left

leg pain, but no anxiety, depression or sleeplessness. (R. at 527.) Lawson reported that prazosin had significantly helped his daily anxiety. (R. at 530.) Dr. Litton's physical examination findings were unchanged from previous visits. (R. at 529.) He diagnosed generalized anxiety disorder and chronic PTSD. (R. at 529.) On December 21, 2020, Lawson saw Dr. Litton for a follow up on hypertension. (R. at 531.) Lawson complained of joint stiffness and left leg pain, but again denied any anxiety, depression or sleep disturbances. (R. at 531.) Dr. Litton noted that Lawson took his medications as directed, but was otherwise noncompliant with the recommended nonpharmacologic treatments for his hypertension. (R. at 531.) Dr. Litton again noted obesity, decreased range of motion with left knee flexion and extension and anxiety during his physical examination, but made no other abnormal findings. (R. at 533.) On February 15, 2021, Lawson saw Dr. Litton for generalized anxiety disorder, and Dr. Litton increased his prazosin dose. (R. at 743, 746.) Physical examination findings were unchanged. (R. at 745.) On March 29, 2021, Lawson reported to Dr. Litton that the increased prazosin had improved his sleep, and he also reported left leg pain and anxiety. (R. at 748.) Physical examination findings, again, remained the same. (R. at 750.) At this visit, Dr. Litton noted that Lawson's anxiety had been well-controlled since the medication increase at his last appointment. (R. at 751.) On April 12, 2021, Lawson again saw Dr. Litton, reporting he had not been able to see his counselor since February of that year. (R. at 752.) Lawson reported left leg pain, anxiety and stress. (R. at 752.) Dr. Litton's physical examination findings remained unchanged, and he referred Lawson to a psychologist for an evaluation and counseling for generalized anxiety disorder with PTSD. (R. at 754-55.)

On May 10, 2021, Lawson saw Dr. Litton for a follow up on his generalized anxiety disorder. (R. at 756.) At this visit, Dr. Litton noted that Lawson was stable and had made an appointment to see a new mental health counselor. (R. at 759.) On June 8, 2021, Lawson saw Dr. Litton to follow up on his generalized anxiety disorder, and he reported a new symptom of shaking in his sleep. (R. at 768.) Dr. Litton offered to increase Lawson's prazosin, but Lawson stated that he wanted to see how he felt after visiting his new counselor. (R. at 768.) On June 30, 2021, Lawson visited Dr. Litton to follow up on hypertension. (R. at 770.) Lawson's pertinent complaints included joint stiffness and left leg pain, and he denied any anxiety, depression or sleep disturbances. (R. at 770.) Dr. Litton again noted that Lawson was compliant with his medications, but not compliant with nonpharmacologic treatments for his hypertension. (R. at 770.) Dr. Litton's physical examination findings included that Lawson had a decreased range of motion with left shoulder flexion and extension, decreased range of motion with left knee flexion and extension and anxiety (R. at 772.) Dr. Litton recommended Tylenol, ice, elevation and exercises for Lawson's shoulder pain. (R. at 774.)

From October 2020 through February 2021, Lawson saw Chris Russell, L.P.C., a licensed professional counselor, for behavioral health services at Jonesville Family Health Center. (R. at 584-99.) During this time, Lawson reported having nightmares and hallucinations of the stabbing incident as well as anger, anxiety, sadness and stress. (R. at 584, 586, 590, 594, 596, 598.) On October 12, 2020, Lawson reported that he felt violent towards others who looked similar to gang members in the area and that he took medication to decrease those feelings. (R. at 584.) During that same visit, Lawson also reported feeling like his PTSD was pushing him to kill himself over his anxiety someday. (R. at 584.) On October

26, 2020, Lawson reported feeling so stressed and overwhelmed that he felt he could "snap," and a gunshot outside of his home had scared him. (R. at 586.) On November 9, 2020, Lawson reported that he had been placed on a new medication to help his sleep and that he had no significant issues or problems to discuss. (R. at 588.) On November 23, 2020, Lawson reported increased anxiety due to his PTSD. (R. at 590.) On December 28, 2020, Lawson again reported increased anxiety and new PTSD triggers. (R. at 594.) On January 12, 2021, Lawson reported paranoia and anxiety because one of the inmates who had threatened his life was being let out in the area. (R. at 680.) Throughout this time, mental status assessments of Lawson showed that he was adequately groomed; his mood was appropriate, sad, mildly anxious, anxious and mixed; his affect was anxious and, at times, appropriate; his eye contact was appropriate; he was oriented to person, place and situation; his thought process was intact; he had no paranoia or delusions; his judgment and insight were good; and he was not homicidal or suicidal. (R. at 584, 586, 588, 590, 592, 594, 596, 598, 680.)

On April 23, 2021, Stephen Saxby, Ph.D., ("Saxby"), a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), and a mental residual functional capacity assessment, ("MRFC"), finding that Lawson's PTSD, depression and anxiety were severely impairing and that while Lawson should not have interactions with the public and only occasional interactions with co-workers and supervisors, he would, otherwise, be capable of simple and routine work. (R. at 112, 117.) He opined Lawson was mildly limited in his ability to understand, remember or apply information; and moderately limited in his ability to interact with others; to concentrate, persist or maintain pace; and to adapt or manage himself. (R. at 113.) Saxby found no deficits with Lawson's memory, and

he noted that Lawson had been able to attend a GED class and go out with his wife when crowds were limited. (R. at 114.) Saxby opined that Lawson was not significantly limited in his ability to carry out very short and simple instructions. (R. at 117.) Saxby also noted that Lawson was moderately limited in five of out eight areas of sustained concentration and persistence. (R. at 117.) Saxby further opined that Lawson was moderately limited in three out of five areas of social interaction. (R. at 117.) Saxby did not find any adaptation limitations. (R. at 117.) Saxby opined that Lawson should not perform work with strict hourly or daily quotas. (R. at 117.)

On September 18, 2021, Jo McClain, Psy.D., ("McClain"), a state agency psychologist, completed a PRTF of Lawson, finding that, despite being severe, Lawson's mental health conditions were stable with medication and treatment. (R. at 126-128.) In an MRFC from the same date, she opined Lawson was mildly limited in his ability to understand, remember or apply information; and moderately limited in his ability to interact with others; to concentrate, persist or maintain pace; and to adapt or manage himself. (R. at 126.) McClain opined that Lawson was moderately limited in four out of eight areas of sustained concentration and persistence. (R. at 132-35.) McClain opined that Lawson was moderately limited in two out of five areas of social interaction, and in one out of four areas of adaptation. (R. at 133.) In her review, McClain incorrectly noted that Lawson was recommended to try prazosin for sleep, but that he was not willing to try this medication.[5] (R. at 128.) McClain concluded her review by finding that

---

[5] Lawson's primary care provider, Dr. Litton, prescribed prazosin on November 2, 2020, and on December 14, 2020, Lawson reported that the prazosin had greatly improved his daily level of anxiety and his impulsive behaviors. (R. at 517, 530.)

Lawson was capable of simple/unskilled work with occasional social interaction. (R. at 135.)

On April 27, 2021, Dr. Daniel Camden, M.D., a state agency physician, completed a medical assessment, finding that Lawson could perform medium work,[6] except stand and/or walk, as well as sit, for six out of eight hours of a workday; occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; and never climb ladders, ropes or scaffolds; avoid even moderate exposure to hazards and noise; he should avoid concentrated exposure to vibration. (R. at 115-16.) On October 1, 2021, Dr. Richard Surrusco, M.D., a state agency physician, also completed a medical assessment finding that Lawson could perform light work,[7] except he could occasionally perform all postural activities; and he should avoid concentrated exposure to vibration and hazards. (R. at 130-32.)

From June 2021 to March 2022, Lawson saw Crystal Burke, L.C.S.W., a licensed clinical social worker, for behavioral health services. Lawson initially saw Burke roughly every two weeks but began seeing her monthly in September 2021. At visits from June to August 2021, Lawson reported that, while he still was struggling with motivation, sleep, focus and crowds, he was taking his medications as prescribed, and they seemed to be helping him somewhat. (R. at 817, 821, 824, 828.) During those times, Lawson scored "severe" on depression and anxiety screenings done at each visit. (R. at 818, 822, 825, 829, 833.) On August 30, 2021,

---

[6] Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, he also can perform sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2023).

[7] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2023).

Lawson scored "severe" on the anxiety screening and "moderately severe" on the
depression screening. (R. at 814.) He also reported improved sleep, but stated that
his nightmares had continued. (R. at 813.) At his September 24, 2021, visit,
Lawson scored "moderate" on both the depression screening and anxiety
screening, and he reported that his main stressors were related to the benefits
processes that he was applying for following the injury. (R. at 855-56.) At his
November 17, 2021, visit, Lawson scored "moderate" on the depression screening
and "severe" on the anxiety screening, reporting anxiety due to his son working at
a prison and finding out that a police officer had recently been harmed. (R. at 852-
53.) On December 9, 2021, Lawson reported he had been experiencing intrusive
thoughts, restless sleep, poor concentration and anxiety because the three-year
anniversary of his work injury had recently passed. (R. at 850.) At that same visit,
Lawson scored "mild" on the depression screening and "moderate" on the anxiety
screening. (R. at 849.)

On January 5, 2022, Lawson scored "moderately severe" on the depression
screening and "moderate" on the anxiety screening. (R. at 846.) Lawson reported
feeling down and having increased anxiety about his health, but feeling
unmotivated to exercise. (R. at 847.) At his February 4, 2022, visit, Lawson scored
"moderately severe" on the depression screening and "moderate" on the anxiety
screening, reporting feeling a loss of interest, tired, down and anxious at times. (R.
at 843-44.) On February 25, 2022, Lawson reported feeling anxious about the
future, experiencing fatigue, having a loss of interest and feeling down. (R. at 841.)
At his last appointment with Burke, on March 18, 2022, Lawson scored
"moderately severe" on a depression screening and "severe" on an anxiety
screening. (R. at 837.) He reported feeling fatigued, having a loss of interest, and

-12-

"feeling down" at this appointment. (R. at 838.) Mental status examinations completed at every appointment revealed that Lawson's appearance and grooming were clean, neat and casual or appropriate; his mood was mixed anxiety and depression; his behavior was congruent with mood and situation; his affect was congruent or appropriate to context, and, on one occasion, restricted; he made adequate eye contact; he was oriented to person, place and situation, and he arrived on time for his appointments; his thought process was preservative; his speech was within the normal range; he had no paranoia, hallucinations or delusions; his judgment and insight were good or adequate; his thought content was intact, and, on one occasion, distractible; and he was not suicidal or homicidal. (R. at 815, 819, 822-823, 826, 830, 834, 838, 841, 844, 847, 850, 853, 856.) Burke's diagnoses of Lawson over this time included major depressive disorder, single episode, severe, without psychotic features; unspecified anxiety disorder; chronic PTSD; and other mental strain related to work. (R. at 813-14, 817-18, 821, 824, 828, 832-33, 840, 843, 846, 849, 852, 855.)

On October 20, 2021, Lawson saw Dr. Litton for a follow-up visit. (R. at 932.) Dr. Litton noted that Lawson was obese, had a decreased range of motion with flexion and extension in his left shoulder and left knee and was anxious. (R. at 934.) The remainder of his examination findings were normal. (R. at 934.) Dr. Litton reported that screening for depression was negative for symptoms of depression, Lawson was feeling better, and his level of stress and anxiety had improved. (R. at 935.) On November 1, 2021, Lawson complained of crepitus, neck stiffness, left upper extremity paresthesia and joint stiffness. (R. at 927.) He denied anxiety, depression and sleep disturbances. (R. at 927.) Dr. Litton sent Lawson for x-rays of the cervical spine and ordered a coronary artery calcium

score, with plans to obtain an electromyography, ("EMG"), study if his condition remained unimproved. (R. at 929.) On December 3, 2021, Lawson complained of moderate intensity pain from paresthesia and decreased grip. (R. at 914.) He also complained of joint stiffness, but denied anxiety, depression and sleep disturbances. (R. at 914.) Dr. Litton referred Lawson to a neurologist to perform an EMG study for the paresthesia. (R. at 916.) On December 27, 2021, Dr. Litton diagnosed Lawson with atherosclerotic heart disease without angina pectoris. (R. at 910.) He referred Lawson to a cardiologist and recommended lifestyle changes. (R. at 912.) During his review of systems, Lawson complained of joint stiffness and paresthesia of the left upper extremity. (R. at 910.) A depression screening was negative for depression. (R. at. 910.) On January 18, 2022, Lawson saw Dr. Herbert Ladley, M.D., a cardiologist, on the referral of Dr. Litton, for an abnormal calcium score. (R. at 862.) Lawson reported fatigue, dyspnea on exertion, irregular heartbeat and palpitations and shortness of breath and sleep disturbances due to breathing. (R. at 864.) He denied any other abnormal symptoms. (R. at 864.) Dr. Ladley performed a physical examination and made no abnormal findings. (R. at 864-65.) He recommended that Lawson control his hypertension by increasing his medication dose, weight loss through diet and activity and to consider bariatric surgery. (R. at 866.) Dr. Herbert also ordered a cardiac positron emission tomography, ("PET"), stress study, which was performed on April 19, 2022, and revealed that Lawson had a reversible myocardial perfusion defect that was consistent with moderate ischemia. (R. at 866, 868-70.) When Lawson saw Dr. Litton on April 21, 2022, to follow up on his visit to Dr. Herbert, Dr. Litton recommended lifestyle changes to help manage Lawson's condition. (R. at 887, 889-90.) A depression screening was negative at that time for depression. (R. at 887.)

From March 25, 2022, to May 5, 2022, Lawson saw Deidra Fisher-Taylor ("Fisher-Taylor"), A.C.S.W./L.C.S.W., a licensed and certified clinical social worker, for behavioral health services approximately three times per week. (R. at 948-989.) The form-based medical records for all 21 visits are identical, with exception to dates, times, and quotes from Lawson during the visit. (R. at 948-89.) Fisher-Taylor described Lawson as appearing anxious, depressed, disheveled, flat-affected, hopeless, paranoid, scared, tearful, tired and withdrawn. (R. at 948, 950, 952, 954, 956, 958, 960, 962, 964, 966, 968, 970, 972, 974, 976, 978, 980, 982, 984, 986, 988.) Fisher-Taylor reported Lawson's symptoms to include severe mood swings and depression; inability to concentrate; problems with memory; crying spells; panic attacks; feeling hopeless, helpless and overwhelmed; anhedonia; hypervigilance; and having a hyper startle reflex, night terrors, insomnia, flash-backs, increased appetite, paranoia and suicidal ideation. (R. at 948, 950, 952, 954, 956, 958, 960, 962, 964, 966, 968, 970, 972, 974, 976, 978, 980, 982, 984, 986, 988.) Fisher-Taylor's "assessment comments" for every appointment stated that Lawson's appearance was disheveled, he had frequent crying spells, flashbacks and night terrors, was practically unable to leave his home without suffering from a crippling panic attack and had suicidal ideation with no plan. (R. at 948, 950, 952, 954, 956, 958, 960, 962, 964, 966, 968, 970, 972, 974, 976, 978, 980, 982, 984, 986, 988.) She diagnosed Lawson with chronic PTSD; severe, major depressive disorder; and agoraphobia with panic disorder. (R. at 948, 950, 952, 954, 956, 958, 960, 962, 964, 966, 968, 970, 974, 976, 978, 980, 982, 984, 986, 988.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2023). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2023).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by

substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Lawson argues the ALJ erred by failing to properly consider his complaints of limitations in memory, handling and fingering. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 12-16.) Additionally, Lawson argues the ALJ erred by improperly evaluating his subjective allegations regarding the severity of his mental symptoms. (Plaintiff's Brief at 16-21.)

A claimant's residual functional capacity refers to the most the claimant can still do despite his limitations. *See* 20 C.F.R. § 404.1545(a) (2023). The ALJ found Lawson had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), except he could occasionally climb stairs and ramps, balance and stoop, but could not kneel, crouch, crawl or climb ladders, ropes or scaffolds; frequently perform reaching and feeling with the left upper extremity; should avoid concentrated exposure to vibrations and industrial hazards; should avoid exposure to loud noise, such as heavy traffic; could perform simple tasks and maintain attention and concentration for two-hour segments with regular breaks; should avoid work with strict hourly or daily production quotas; could occasionally interact with co-workers and supervisors, but should work independently and not in tandem with others; could not interact with the public; could adapt to occasional changes in the customary workplace setting; would be off task 10 percent of the workday; and would be absent from work one day per month. (R. at 26.)

Lawson argues that the ALJ erred by not properly considering his complaints of memory-related symptoms. (Plaintiff's Brief at 15.) In support of his position, Lawson points to his testimony during the hearing, where he reported having difficulty remembering conversations with people, things his wife told him and trouble remembering where he was going when driving. (R. at 65.) Further, Lawson points to self-reported memory complaints in Function Reports from March and June of 2021. (R. at 255, 272.) Lastly, Lawson points to the treatment records of Fisher-Taylor, who noted that Lawson alleged memory complaints at every appointment. (R. at 950-88.) Lawson concludes his argument by asserting that the ALJ did not appropriately explain the inconsistencies between Lawson's statements and the residual functional capacity findings in his decision, specifically, that the overall records from Fisher-Taylor support a mental health impairment that is consistent with Lawson's complaints of significant mental health limitations.

As stated above, the court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman*, 829 F.2d at 517. When making a residual functional capacity assessment, the ALJ must consider all of the relevant evidence, including the medical records, medical source opinions and the individual's subjective allegations and description of his own limitations. A residual functional capacity assessment "includes a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence." Social Security Ruling, ("S.S.R."), 96-8p, 1996 WL 374184, at *7 (July 2, 1996). The Fourth Circuit has recognized

that, while ALJs must generally explain how conflicting evidence was reconciled to facilitate judicial review, they do not labor under the impossible obligation to refer to every piece of evidence on the record. *See Thomas v. Berryhill*, 916 F.3d 307, 312 (4th Cir. 2019) (citation omitted). Therefore, this court's role is to determine if there is substantial evidence to support the finding that Lawson suffers from a "mild" limitation in understanding, remembering and applying information. (R. at 23.) For the reasons that follow, I find that there is.

The ALJ first evaluated Lawson's complaints of memory in steps two and three of the five-step analysis described above. (R. at 22-23.) When determining Lawson's mental residual functional capacity, the ALJ must first determine if the severity of Lawson's mental health impairments, considered singly and in combination, meet or medically equal the criteria laid out in 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.04 (depressive, bipolar and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), and 12.15 (trauma- and stressor-related disorders). In making his finding, the ALJ must look at the paragraph "B" criteria of each listing, which directs that the alleged mental impairments must result in extreme limitation of one, or marked limitation of two, of the four broad areas of mental functioning laid out in "paragraph B."[8] While the limitations laid out in the "paragraph B" criteria are not a residual functional capacity assessment, they are used to rate the severity of the mental impairments at steps two and three

---

[8] These four areas of mental functioning are a claimant's ability to understand, remember, or apply information; to interact with others; to concentrate, persist or maintain pace; and to adapt or manage oneself. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(E) (2023). A limitation is "marked" if the individual's functioning in the area "independently, appropriately, effectively, and on a sustained basis is seriously limited." 20 C.F.R. Pt, 404, Subpt. P, App. 1 § 12.00(F)(2)(d). An "extreme" limitation means that the individual is "not able to function in this area independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F)(2)(e).

of the sequential evaluation process. The mental residual functional capacity assessment used at steps four and five of the sequential evaluation process requires a more detailed assessment, but the residual functional capacity assessment reflects the degree of limitation the ALJ had found in his "paragraph B" mental function analysis. (R. at 25.) In support of his finding related to Lawson's memory, the ALJ found that Lawson had a "mild" limitation. (R. at 22.) He acknowledged Lawson's subjective complaints of difficulty with memory, understanding and following instructions. (R. at 22.) However, the ALJ found that treatment notes did not reflect significant memory limitations. (R. 22, 544, 584, 592, 598, 819, 826, 838, 844, 853.) Specifically, the ALJ noted that a mental status assessment in January 2021 reflected that Lawson had intact orientation and thought process, no paranoia or delusions and good judgment and insight. (R. at 22-23, 544.) The ALJ further noted that, in August 2021 and March 2022, Lawson's judgment and insight were described as good and adequate. (R. at 23, 819, 838.) The ALJ found that Lawson's activities of daily living required some memory capability, such as driving, going out alone, online shopping and operating a riding lawn mower. (R. at 23, 252-53, 269-70.) Further, the medical opinions from the two state agency psychologists who examined Lawson's records comport with the ALJ's finding, as both psychologists found that Lawson had a "mild" limitation in his ability to understand, remember and apply information. (R. at 33, 113, 126.) Additionally, the medical opinions of Chris Russell and Dr. Litton do not cite any deficit in Lawson's memory. (R. at 34.) The record reflects, therefore, that the ALJ considered the entire record when making his "paragraph B" determination, and his finding of only a "mild" limitation in Lawson's ability to remember is supported by substantial evidence.

Lawson also argues that the ALJ failed to address his deficits in handling and fingering and that the ALJ did not explain the inconsistencies between Lawson's statements and the ALJ's residual functional capacity findings in his decision. (Plaintiff's Brief at 12-15.) Lawson asserts that his limitations in handling and fingering are a direct result of his cervicalgia, shoulder pain and hand hypoesthesia. (Plaintiff's Brief at 12.) Lawson argues that the record establishes deficits in handling and fingering, referring to his need to switch hands with which he was holding the phone during his telephonic administrative hearing, as well as his complaints to treating physicians of left extremity pain from November 2021 to January 2022. (R. at 59, 862, 914, 927.)

The Fourth Circuit recently reiterated the two-step framework, set forth in 20 C.F.R. § 404.1529 and S.S.R. 16-3p, 2017 WL 5180304 (Oct. 25, 2017), for evaluating a claimant's symptoms, such as pain.[9] See *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83 (4th Cir. 2020). First, the ALJ must determine whether objective medical evidence[10] presents a "medically determinable impairment" that could reasonably be expected to produce a claimant's alleged symptoms. *Arakas,* 983 F.3d at 95 (citations omitted); *see also Craig v. Chater,* 76 F.3d 585, 594 (4th Cir. 1996). Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether he is disabled. *See Arakas*, 983 F.3d at 95 (citations omitted); *see also Craig,* 76 F.3d at 595. Because

---

[9] "Symptoms" are defined in the regulations as a claimant's own description of his medical impairment. *See* 20 C.F.R. § 404.1502(i) (2023).

[10] The regulations define "objective medical evidence" as "evidence obtained from the application of medically accepted clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motion disruption." 20 C.F.R. § 404.1529(c)(2) (2023).

"[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques," ALJs must consider the entire case record and may "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. S.S.R. 16-3p, 2017 WL 5180304, at *5; *see also* 20 C.F.R. § 404.1529(c)(2) (2023); *Craig,* 76 F.3d at 595. In other words, "while there must be objective medical evidence of some condition that could reasonably produce the pain, there need not be objective evidence of the pain itself or its intensity." *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989); *see also Craig*, 76 F.3d at 593.

However, the Fourth Circuit has held that objective medical evidence and other objective evidence are "crucial" in evaluating the second prong of the symptom analysis test. *Craig*, 76 F.3d at 595. In *Craig*, the Fourth Circuit stated "[a]lthough a claimant's allegations about [his] pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges [he] suffers." 76 F.3d at 595. Specifically, the ALJ must consider "any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence, including [his medical] history, the signs and laboratory findings, and statements by [his] medical sources or other persons about how [his] symptoms affect [him]." 20 C.F.R. § 404.1529(c)(4). The regulations direct that a claimant's "symptoms, including pain, will be determined to diminish [his] capacity for basic work activities to the extent that [his] alleged functional limitations and restrictions due

to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(c)(4).

Here, the ALJ stated as follows in his decision:

… [T]he undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and Social Security Ruling 16-3p…

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

(R. at 26.) In this case, the ALJ found that Lawson's medically determinable impairments could reasonably be expected to cause the alleged symptoms, satisfying the first part of the symptom analysis test. (R. at 28.) *See Arakas,* 983 F.3d at 95. However, the ALJ also found that Lawson's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. (R. at 28-

29.) The real issue, therefore, is whether the ALJ correctly analyzed Lawson's allegations of handling and fingering limitations under the second part of this test. For the reasons that follow, I find that he did.

In his decision, the ALJ stated that "the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. at 28-29.) To support this finding, the ALJ first summarized Lawson's allegations of disabling functional limitations and pain. (R. at 27-28.) The ALJ noted that Lawson claimed to be prevented from doing fine motor skill activities due to shaking from anxiety and panic, that Lawson had shoulder pain and numbness in his left arm and both hands and that Lawson had carpal tunnel syndrome, which was worse on the left and sometimes caused difficulty grasping and holding onto small objects. (R. at 27.)

The ALJ then discussed the objective medical evidence of record, which he found to be partially consistent with other evidence. (R. at 32.) The ALJ noted that Lawson first complained of left shoulder pain in June 2021, and the subsequent physical examination showed a decreased left shoulder range of motion in flexion and extension. (R. at 32, 772.) However, the ALJ noted that x-ray imaging from July 2021 showed normal findings in the bilateral clavicles and left shoulder. (R. at 32, 786.) The ALJ then noted that, in November 2021, Lawson complained of neck pain radiating into the left upper extremity, and in December 2021, he complained of left hand numbness with paresthesias and decreased grip in both hands, and examination at that time showed a deceased range of motion in the left shoulder and hypoesthesia in the left ulnar nerve distribution. (R. at 32, 913, 927.) The ALJ

noted that a referral was initiated to a neurologist pursuant to the December 2021 doctor's visit for electrodiagnostic studies, but there are no test results from that visit in the medical record. (R. at 32, 916.) The ALJ also noted that, during a January 2022 cardiology visit, Lawson's left hand and arm were braced due to carpal tunnel symptoms, but a physical examination showed normal strength and reflexes. (R. at 32, 862, 865.) Lastly, the ALJ noted that primary care treatment notes from early 2022 do not reflect a detailed discussion of Lawson's alleged neck and left upper extremity pain, and Lawson's primary care physician treated his symptoms conservatively with medications. (R. at 32, 929.) In addition to Lawson's treating history, the ALJ considered assessments from two state agency medical consultants. (R. at 35.) However, neither of the state agency medical consultants was able to review all of the available evidence, including the more recent primary care records that described Lawson's neck and left upper extremity pain. (R. at 35.) Because the ALJ determined that Lawson had manipulative limitations based on his neck and left upper extremity pain, the ALJ found the assessments by the state agency medical consultants to be mostly unpersuasive. (R. at 35.)

For all of the above-stated reasons, I find that the ALJ did not improperly disregard Lawson's subjective allegations about his memory, as well as his handling and fingering limitations. To the contrary, the ALJ thoroughly considered such statements and credited them to the extent that they were consistent with the record as a whole. As stated herein, in making the determination at the second prong of the symptom evaluation framework, the ALJ must examine the entire case record, including the objective medical evidence, the claimant's statements about the intensity, persistence and limiting effects of his symptoms, statements and

other information provided by medical sources and other persons and any other relevant evidence in the claimant's record. *See* S.S.R. 16-3p, 2017 WL 5180304, at 4*. Here, the ALJ reviewed Lawson's relevant medical history and his subjective allegations before finding that his statements regarding the severity of his limitations were not entirely credible because they were not fully supported by the objective medical evidence and his treatment history. The ALJ was entitled to find that the objective medical evidence outweighed Lawson's subjective statements, and he provided a sufficient rationale for doing so. It is well-settled that a reviewing court gives great weight to an ALJ's assessment of a claimant's credibility and should not interfere with that assessment where the evidence of record supports the ALJ's conclusions. *See Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984.) Here, the decision was thorough and applied the proper legal standard, and this court will not reweigh the evidence.

Lastly, Lawson argues that the ALJ erred by not properly evaluating his subjective mental health allegations. (Plaintiff's Brief at 16-21.) Specifically, Lawson argues that his mental limitations were not consistent with the residual functional capacity found by the ALJ. (Plaintiff's Brief at 16.) Similar to the analysis completed above, the ALJ was tasked with determining, first, whether Lawson had a medically determinable mental health impairment that could reasonably be expected to produce his symptoms, and, secondly, the ALJ must evaluate the intensity and persistence of Lawson's symptoms to determine the extent to which they limit his ability to perform work-related activities. *See Arakas*, 983 F.3d 83. Lawson cites symptoms such as an inability to be around strangers; problems completing tasks, concentrating, understanding, following instructions and getting along with others; and having flashbacks and anxiety

attacks, as reflecting a more severe mental residual functional capacity limitation than the ALJ found. (Plaintiff's Brief at 16.) In support of his mental residual functional capacity limitation, the ALJ considered the objective medical evidence, Lawson's subjective complaints and the medical opinions in the record. (R. at 27-30, 33-34.) The ALJ found that Lawson's subjective complaints were partially consistent with other evidence. (R. at 29.) In support of that position, the ALJ noted that Lawson developed PTSD after being attacked at work. (R. at 29, 333.) The ALJ noted that Lawson consistently was experiencing PTSD symptoms at this time, such as flashbacks, nightmares and difficulty sleeping, and he also was dealing with an aggravation of his general anxiety disorder. (R. at 29, 337, 341) The ALJ also noted that, during this time, Lawson's primary care provider prescribed and adjusted several medications. (R. at 29, 390, 517, 908.) Further, the ALJ noted that Lawson was diagnosed with major depressive disorder in January of 2022. (R. at 29, 846-47.) Despite the persistence of Lawson's symptoms, however, the ALJ noted that mental status examinations showed mostly normal findings. (R. at 29-30, 529, 544, 584, 592, 819, 823, 830, 850, 853, 856.) Moreover, the ALJ noted that Lawson's symptoms were alleviated by outpatient medication management and counseling. (R. at 30.) For example, the ALJ notes that in December of 2020, Lawson's primary care provider initiated Lawson on prazosin, and Lawson reported that this medication greatly improved his daily level of anxiety. (R. at 30, 530.) *See Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling."). Lawson specifically asserts that the records from Deidre Fisher-Taylor support a finding of a more severe impairment than the ALJ found. (Plaintiff's Brief at 19.) However, the ALJ cited records from this provider twice in his residual functional capacity analysis, but noted that they were

duplicative and concurrent records from different providers made conflicting findings. (R. at 29-30.) Specifically, the ALJ noted apparent duplicate entries in Fisher-Taylor's records, "as the findings are identical from one encounter to the next, even as the claimant's complaints changed." (R. at 30.) Based on these findings, the ALJ determined that Lawson's assertions of the severity of his mental symptoms and functional loss were not entirely consistent with other evidence in the record. (R. at 29.) The ALJ determined that, due to Lawson's ongoing psychiatrically based signs and symptoms, he should be limited to simple tasks at work and should have reduced exposure to noise, interaction with others, workplace changes and quota-based work. (R. at 29.)  I find that this residual functional capacity finding is based on substantial evidence for all of the reasons stated above.

For all of the foregoing reasons, I find that the ALJ's evaluation of Lawson's complaints of memory were based on a correct legal standard and is supported by substantial evidence. I further find that substantial evidence supports the ALJ's finding as to Lawson's ability to handle and finger. Lastly, I find that the ALJ applied the correct standard to Lawson's subjective allegations related to his mental impairments, and there is substantial evidence to support the ALJ's residual functional capacity limitations, as well as the ultimate finding that Lawson was not disabled under the Act and was not entitled to benefits.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's analysis of Lawson's memory;

2. Substantial evidence exists in the record to support the ALJ's analysis of Lawson's ability to handle and finger;

3. Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

4. Substantial evidence exists in the record to support the Commissioner's finding that Lawson was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Lawson's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed

findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    February 29, 2024.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE